**BLACK LAKE PIPE LINE COMPANY,
Appellant,**

v.

**UNION CONSTRUCTION COMPANY, INC.,
et al., Appellees.**

**No. 5345.**

Court of Civil Appeals of Texas,
Waco.

Jan. 23, 1975.

Rehearing Granted in Part March 6, 1975.

Second Rehearing Denied March 27, 1975.

Meredith & Donnell, M. W. Meredith, Jr., Finley L. Edmonds, Corpus Christi, for appellant.

Mahoney, Shaffer, Hatch & Layton, Lee Mahoney, Corpus Christi, McMahon, Smart, Sprain, Wilson, Camp & Lee, Stanley P. Wilson, Abilene, for appellees.

HALL, Justice

On January 4, 1967, Mobile Pipe Constructors, Inc., and Dillingham Construction Company, joint venturers known as Mobile Pipe-Dillingham (hereinafter called "MPD") agreed in writing to construct an 8⅝″ diameter pipe line, extending approximately 125 miles from a place in Natchitoches Parish, Louisiana, to a point in Hardin County, Texas, for Black Lake Pipe Line Company ("Black Lake"). Substantially all of the work to be performed under the contract was subcontracted by MPD to McCathern, Inc. McCathern retired from the job in July, 1967. MPD thereupon subcontracted to Union Construction Company, Inc., ("Union") for construction of about 67 miles of the pipeline, and performed the remainder of the work itself. All of the terms and conditions and applicable plans and specifications of the contract between Black Lake and MPD were incorporated into and made a part of the contract between MPD and Union. The contract called upon Black Lake to furnish the needed pipe for this phase of the construction.

The original completion date according to the contract was April 15, 1967. Various extensions were granted by Black Lake to June 15th, to August 1st, and, finally, to August 15th, 1967, for completion of a usable pipeline, plus a reasonable time thereafter for completion of the cleanup work.

All of the parties agree that Union and MPD have completed and have been paid for the work contemplated and called for by the terms, plans and specifications of the contracts. However, this lawsuit stems from a dispute between the parties as to just what amount of work was required under the contracts.

Union initiated this suit against Black Lake and MPD for payment of particularized work which it claims was in excess of the work required by its contract. Union pleaded that Black Lake, through its representatives on the job, continuously refused to accept and approve work done by Union under its contract unless and until Union satisfied Black Lake's representatives by performing work over and above that called for by the contract; that, under the circumstances, these requirements for extra work were arbitrary and capricious and were based upon unreasonable constructions and interpretations of the job plans and specifications; that Union was forced to comply with the requirements for extra work in order to secure acceptance and approval of its work under the contract and to complete the pipeline; that the extra work was therefore obtained by Black Lake under and as a result of business compulsion and economic duress; that the excess work has a reasonable value of $315,910.08; that the requirements and activities by Black Lake "substantially interfered" with Union's performance of its contract, resulting in its damages in the amount of $315,910.08; that a direct contractual relationship existed between Union and Black Lake because throughout construction of the pipeline Black Lake's representatives on the job directed and supervised Union's employees in the work being done, and because Black Lake entered into various agreements with Union, both oral and written, concerning construction of the pipeline; and that Black Lake accepted the benefits of the extra work knowing that Union expected to be paid therefor at the applicable extra work rates and at prices which were fair and reasonable therefor.

Answering Union's suit, MPD alleged that all of the work for which Union seeks recovery was ordered and required by Black Lake; and that Black Lake, not MPD, is liable therefor. And, in the event Union recovered from MPD, it sought indemnity from Black Lake. MPD then pleaded a cross-claim against Black Lake for payment for specified work allegedly in excess of its written contract. In this regard, MPD's pleadings were substantially the same as Union's pleadings, with assertions of economic duress, and arbitrariness on the part of Black Lake. MPD asserted that the reasonable value of its extra work was $346,966.56. Alternatively, MPD alleged that the extra-contractual activities and requirements by Black Lake "substantially interfered" with MPD's performance of its contract with Black Lake and its subcontractors on the job, resulting in its damages in the amount of $346,966.56.

In alternative pleas, both Union and MPD pleaded for recovery on quantum meruit.

In its answer, Black Lake denied that MPD or Union had performed extra work and pleaded, inter alia, that if they did so, they failed to comply with the "Extra Work" provisions of the contract for establishment and payment of "extra work" claims; and thereby led Black Lake to believe the claims would not be made; and were estopped to make the claims or had waived them.

Trial was to a jury. The following are the effect of the jury's answers to special issues pertinent to a proper disposition of this appeal.

It found (1), (2) that Black Lake required Union to do more work in connection with terracing and furrowing across a portion of the pipeline right of way than was reasonably necessary to direct the flow of water into natural drainage courses, and, (3), (4) that Black Lake arbitrarily and capriciously refused to approve Union's terrace and furrow work unless this extra work was done; (6) that this was

done by Union under duress; (5) that $5,893.51 would reasonably compensate Union for it; and, it failed to find (7), (8) that Union, by its acts, conduct or silence, waived its right to assert a claim for compensation for this work or led Black Lake to believe that such claim would not be made;

It found (10) that Black Lake required Union to remove brush, uprooted tree stumps or brush trimmings from property other than the pipeline right of way, after (11), (12) Black Lake had previously approved the placing of this debris outside the right of way under agreements with adjoining landowners, and (13), (14) that Black Lake arbitrarily and capriciously refused to approve Union's cleanup phase of the work without the performance of this extra work; (15) that Union did this extra work under duress; (16) that $12,862.94 would reasonably compensate Union for it; and it failed to find (17), (18) that Union, by its acts, conduct or silence, waived its right to assert a claim for compensation for this work or led Black Lake to believe that such claim would not be made;

It found (20), (21) that on or about July 5, 1967, Black Lake required Union to add a "second spread" (meaning a material increase of men and equipment it was using on the job); (23) that this addition was made by Union under duress; (27) that this addition increased Union's cost of completing the work; and (28) that $109,415.50 would reasonably compensate Union for it; and it failed to find (22) that this requirement was arbitrary or capricious; or (24) that Union could have completed its 67 miles of the pipeline "ready to receive and transport petroleum products" by August 15, 1967, without the second spread; or (26) that, "but for the acts, conduct and requirements of Black Lake," Union could have so completed its portion of the pipeline by August 1, 1967, without the second spread; or (25) that prior to June 19, 1967, Black Lake approved August 15, 1967, as the completion

date of Union's 67 miles as a pipeline ready to receive and transport; or (29), (30) that Union, by its acts, conduct, or silence, waived its right to assert a claim for compensation for the second spread expense or led Black Lake to believe that such claim would not be made;

It found (32), (33) that Black Lake required Union to do more crown work over the pipeline than was reasonably necessary to backfill all such crown directly over the ditch to a height not less than eight inches nor more than twelve inches above adjacent ground surface; and (34), (35) that Black Lake arbitrarily and capriciously refused to approve the backfilling portion of Union's work unless this extra crown work was done; (36) that this work was done by Union under duress; (37) that $6,833.75 would reasonably compensate Union for it; and, it failed to find (38), (39) that Union, by its acts, conduct, or silence, waived its right to assert a claim for compensation for the extra crown work or led Black Lake to believe that such claim would not be made;

It found (41), (42) that Black Lake required Union to uncover for additional inspection a portion of the pipeline which had the prior approval of Black Lake's representative when it was placed in the ditch, and (43), (44) that Black Lake arbitrarily and capriciously refused to approve Union's work unless this extra work was done; (45) that this work was done by Union under duress; (46) that $3,120.31 would reasonably compensate Union for it; and it failed to find (47), (48) that Union, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this extra work or led Black Lake to believe that such claim would not be made;

It found (50) that Black Lake required Union to use inside air clamps for pipe alignment; (53) that inside air clamps were used by Union under duress; (54) that the use of inside air clamps increased Union's expenses; (55) that $3,547.95 would reasonably compensate Union for

this added expense; and it failed to find (51) that Black Lake refused to approve Union's pipe welding procedure unless it used inside air clamps; or (56), (57) that Union, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this extra expense or led Black Lake to believe that such claim would not be made;

It found (59), (60) that Black Lake required Union to do more cleanup work on a portion of the right of way than was reasonably necessary under the circumstances to provide a pipeline right of way of reasonable appearance and serviceability, and that (61), (62) Black Lake arbitrarily and capriciously refused to approve the cleanup phase of Union's work unless this extra work was done; (63) that this work was done by Union under duress; (64) that $10,722.40 would reasonably compensate Union for it; and it failed to find (65), (66) that Union, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this work or led Black Lake to believe that such claim would not be made;

It found (68), (69) that Black Lake required Union to do more disking on a portion of the right of way than was reasonably necessary to leave all pastureland in a fallow condition, and (70) that Black Lake refused to accept Union's cleanup operation unless this extra work was done; (73) that $1,311.40 would reasonably compensate Union for it; and it failed to find (71) that Black Lake's refusal to accept Union's cleanup operation without the extra disking was arbitrary and capricious; or (72) that the extra disking was done by Union under duress; or (74), (75) that Union, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this extra work or led Black Lake to believe that such claim would not be made;

It found (77), (78) that Black Lake failed to keep pipe available for Union and thereby caused Union extra expense; that (79) $6,388.85 would reasonably compen-

sate Union for this expense; and, it failed to find (80), (81) that Union, by its acts, conduct, or silence waived its right to assert a claim for this extra expense or led Black Lake to believe that such claim would not be made;

It found (92) that Black Lake failed to furnish Union and MPD adequate specifications for the proper performance of the desired work;

It found (96), (97) that Black Lake required MPD to do more cleanup work on the right of way than was reasonably necessary under the circumstances to provide a pipeline right of way of reasonable appearance and serviceability; (98), (99) that Black Lake arbitrarily and capriciously refused to approve the cleanup phase of MPD's work unless this extra work was done; (100) that this work was done by MPD under duress; (101) that $32,244.75 would reasonably compensate MPD for it; and it failed to find (102), (103) that MPD, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this work or led Black Lake to believe that such claim would not be made;

It found (105), (106) that Black Lake required MPD to do more work in connection with terracing and furrowing across the pipeline right of way than was reasonably necessary to direct the flow of water into natural drainage courses; and (107), (108) that Black Lake arbitrarily and capriciously refused to approve MPD's terrace and furrow work unless this extra work was done; (109) that this work was done by MPD under duress; (110) that $39,410.25 would reasonably compensate MPD for it; and it failed to find (111), (112) that MPD, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this extra work or led Black Lake to believe that such claim would not be made;

It found (114) that Black Lake required MPD to remove brush, uprooted tree stumps or brush trimmings from property

other than the pipeline right of way, after (115), (116) Black Lake had previously approved the placing of this debris outside the right of way under agreements with adjoining landowners, and (117), (118) that Black Lake arbitrarily and capriciously refused to approve MPD's cleanup phase of the work without the performance of this extra work; (119) that MPD did this extra work under duress; (120) that $22,200.50 would reasonably compensate MPD for it; and it failed to find (121), (122) that MPD, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this work or led Black Lake to believe that such a claim would not be made;

It found (134) that MPD, through a subcontractor other than Union, was required by Black Lake to provide more excavation at the tailrace of Toledo Bend Dam than was contemplated by the drawings furnished for bid purposes to MPD by Black Lake; (135) that the reasonable value of this work was $1,573.00; and it failed to find (136), (137) that MPD, by its acts, conduct, or silence, waived its right to assert a claim for compensation for this work or led Black Lake to believe that such a claim would not be made; and,

It found (147) that Black Lake failed to furnish MPD with adequate specifications for the proper performance of the desired work.

Judgment was rendered on the verdict that Union recover $160,096.61 from Black Lake and that MPD recover $95,428.50 from Black Lake.

Union and MPD asserted throughout the trial that the work for which they seek compensation in this case was extra work outside their express contractual obligations. Black Lake defended on the ground that all work performed on the pipeline by Union and MPD was required by their written contracts. This was the primary issue between the parties. The case was tried and submitted to the jury with this as its central issue. In every instance material to the judgment the jury made findings which, in the light of the whole record, bear interpretation that the work was beyond the parties' contracts and was required to be done by Black Lake. The sufficiency of the evidence to support these basic findings is not challenged.

Union and MPD sought, and seek, recovery on two theories: (1) their claim that they were arbitrarily required to do the extra work under economic duress to prevent unjust withholding of retainage under the contract by Black Lake and to prevent unjust termination of the contract by Black Lake; and (2) quantum meruit.

Without dispute in the record, Black Lake received the benefit of all work done on the pipeline by Union and MPD. This fact coupled with the jury's findings of the reasonable value of the work and that Black Lake required the work be done supports the judgment on the theory of quantum meruit.

Black Lake argues that Union and MPD cannot recover upon quantum meruit because (1) there is no evidence that the work for which extra compensation is claimed was rendered under circumstances as to reasonably notify Black Lake that it was expected to pay for the work; (2) the existence of express contracts precludes a quantum meruit recovery; and (3) neither complied with the provisions of their contracts dealing with claims for pay for extra work. These contentions are overruled.

When Black Lake *required* Union and MPD to do the extra work, as found by the jury, it impliedly agreed to pay a reasonable compensation therefor. Harell v. Zimpleman, 66 Tex. 292, 17 S. W. 478, 479; 62 Tex.Jur.2d 469, Work, Labor, And Materials, § 3. Accordingly, there was no reason for Union and MPD to notify Black Lake they expected it to pay for the work.

The mere fact that a part of the work performed by Union and MPD for Black

Lake was done under express contract does not prohibit a recovery for the extra work upon quantum meruit. "It is the established rule in this state that one who has rendered services in addition to those stipulated in an express contract can recover therefor where the services rendered were performed at the request or with the knowledge or consent of the other party, and that the acceptance of such services by the other party raises the presumption that the services were given and received in the expectation of being paid for, where the circumstances are such that the person who received them and was benefitted by the services and understood, or ought to have understood, that the services were to be compensated." City of Galveston v. O'Mara (Tex.Civ.App.—Galveston, 1940) 146 S.W.2d 416, 420–421; affirmed by the Supreme Court as "correctly announcing the law," 138 Tex. 16, 155 S.W.2d 912 (1941).

■ The parties' contracts have provisions setting forth the "Procedure For Submitting Extra Work Invoices," the "Wage Rate Schedule For Extra Work," and the "Equipment List And Rental Schedule For Extra Work." Although noncompliance with these provisions was affirmatively pleaded by Black Lake, the jury refused to make findings favorable to it, and this action by the jury is not questioned. In any event, by their own terms these provisions relate solely to additional work resulting from an enlargement of the "scope of the work to be done under the contract" by Black Lake and "amendments, deletions or additions to the Technical Specifications" of the contract by Black Lake; and it is undisputed that no such enlargements or amendments formed the basis of the work in question. Walter M. Bellairs, who was the pipeline project manager for Black Lake during its construction and who is now an employee of the successor of Black Lake's parent company, expressed Black Lake's position at the time of trial in these words: "We see nothing [in Union's and MPD's claims] which we think is extra work [under the contracts] . . . and wouldn't have issued work orders for them."

Upon the trial, purported summaries of Union's and MPD's voluminous business records were admitted into evidence in support of the claims against Black Lake. Many objections were leveled at the summaries, including the objections that they are hearsay, that the records upon which they are based were not produced in court, and that the admissibility of the underlying records was not established.

■ It seems to be the settled rule in Texas that a summary of voluminous records may, in the discretion of the trial court, be admitted into evidence provided that all of the source records are shown to be admissible and are produced in court or are otherwise available to the opposing party for purposes of audit and cross-examination. Dallas Railway & Terminal Co. v. Guthrie, 146 Tex. 585, 210 S.W.2d 550, 551–552 (1948); Cooper Petroleum Co. v. LaGloria Oil And Gas Co. (Tex. Sup., 1969) 436 S.W.2d 889, 891; Lewis v. Southmore Savings Association (Tex.Sup., 1972) 480 S.W.2d 180, 187.

Union and MPD assert that a predicate was laid for the admission of the business records supporting their summaries in accordance with Article 3737e, Vernon's Ann.Texas Civil Statutes. This statute creates an exception to the hearsay rule and makes a memorandum or record of an act, event or condition competent evidence of the act or event or the existence of the condition, provided the identity and mode of preparation of the memorandum of record are established as provided therein. Among other requirements, the memorandum or record must be made "at or near the time of the act, event or condition or reasonably soon thereafter."

■ In many particulars which we need not detail, the records supporting the summaries in question were prepared long after the events recorded therein. Some were

made in connection with the preparations of the summaries. And, in part, the summaries were based upon oral statements and assumptions. Moreover, portions of the underlying records were not produced in court and were apparently unavailable at time of trial; and there is no showing that all of the supporting records have ever been made available to Black Lake. The summaries were not admissible.

Black Lake asserts that without the summaries, there is no evidence, or, alternatively, there is only factually insufficient evidence in the record to support the jury's monetary findings of damages. Similarly, Black Lake challenges the findings that Union and MPD did the extra work under duress; that Black Lake acted arbitrarily and capriciously; and that Black Lake had approved the placing of debris onto property adjoining the pipeline right of way which it subsequently required Union and MPD to remove therefrom.

The transcription of the testimony in this case is extraordinarily long. The exhibits are multitudinous. We have examined the entire record and we are convinced that the evidence is legally and factually sufficient to support the findings challenged by Black Lake. In fact, the jury's careful tracking of the evidence in making its answers to all of the special issues, for and against all of the parties, after a trial which lasted over six weeks, is impressive.

■ Although it is fit to do so on occasion, we are not required to set out evidence shown by the record in disposing of points of error. Price v. Humble Oil & Refining Co. (Tex.Civ.App.—Dallas, 1941, writ ref. w/m) 152 S.W.2d 804, 814; Hunt v. Merchandise Mart, Inc. (Tex.Civ.App.—Dallas, 1965, writ ref., n. r. e.) 391 S. W.2d 141, 146; Jackson v. International Service Ins. Co. (Tex.Civ.App.—Fort Worth, 1970, writ ref., n. r. e.) 450 S.W.2d 896, 897; Hammond v. Stricklen (Tex. Civ.App.—Tyler, 1973, writ ref. n. r. e.)

498 S.W.2d 356, 361. No useful purpose could be served by setting out the facts of this lengthy record.

The judgment allows Union and MPD interest on the principal amounts of their recoveries from November 28, 1967, the date Black Lake formally acknowledged the completion of all construction work on the project and accepted it, to the date of judgment, which was November 27, 1972. Black Lake assigns error to these awards of interest, asserting they are not supported by pleadings. We sustain this point.

The only reference in Union's and MPD's pleadings to interest is in their prayers in which they ask simply "for interest." These prayers are not coupled with any pleading or claim in the petitions for any sum above the actual damages alleged; and Union and MPD were not entitled as a matter of law to pre-judgment interest in this case. Under these circumstances, the simple prayers "for interest" are not sufficient pleadings to support awards of interest as damages. See Humble Oil & Refining Co. v. Kishi (Tex.Civ. App.—Beaumont, 1927, writ ref.) 299 S.W. 687, 691; Brooks Supply Co. v. First State Bank of Electra (Tex.Civ.App.—Waco, 1927, no writ) 292 S.W. 631, 632; Pereira v. Gulf Electric Company (Tex.Civ.App.—Waco, 1961, writ ref., n. r. e.) 343 S.W.2d 334, 336; City of Houston v. Anchor-Hocking Glass Corp. (Tex.Civ.App.—Houston 1st, 1971, writ ref., n. r. e.) 467 S.W.2d 677, 680.

Black Lake brings forward other points and contentions, including some which attack that portion of the judgment based upon the failure of Black Lake to keep pipe available for Union. All of these contentions have been duly considered. Some are immaterial. The others are without merit. All are overruled.

The judgment is reformed to delete therefrom the awards to Union and MPD of interest from November 28, 1967, to the

date of judgment. As reformed, the judgment is affirmed.

Costs are taxed one-fifth to Union and MPD, and four-fifths to Black Lake.

## ON MOTIONS FOR REHEARING

Union and MPD assert in their motion for rehearing that we erred when we held they are not entitled to interest as damages, and when we taxed costs against them based upon the holding. We agree.

In addition to their simple prayers for "interest," mentioned above, Union and MPD also prayed "for such other and further relief, both special and general," to which they may be entitled. No exception was leveled at these pleadings.

If interest is a proper element of damages, then it is such as a matter of law. Watkins v. Junker, 90 Tex. 584, 40 S.W. 11, 12 (1897). There, the Court said that "in all cases where the measure of recovery is fixed by the conditions existing at the time the injury is inflicted, the person entitled to recover has also the right to have compensation for the detention of the money to which he is entitled by reason of the wrong done to him." A recovery on quantum meruit is within the application of this rule. Davidson v. Clearman (Tex. Sup., 1965) 391 S.W.2d 48, 51. Accordingly, Union and MPD were entitled to interest at the legal rate of 6% on their recoveries from November 27, 1972—the day Black Lake acknowledged completion of the project and accepted it—until the date of judgment, as a matter of law, whether prayed for or not. In any event, the prayers of Union and MPD, in the absence of exceptions, were sufficient to support the awards of interest. Rule 90, Vernon's Texas Rules of Civil Procedure; Scott v. Gardner, 137 Tex. 628, 156 S.W. 2d 513, 515 (1941); John F. Buckner & Sons v. Arkansas Fuel Oil Corp. (Tex. Civ.App.—Waco, 1958, writ ref., n. r. e.) 319 S.W.2d 204, 207.

The complaints in Black Lake's motion for rehearing are without merit. The motion is overruled. The contention of Union and MPD that we erred in holding that the business records summaries were inadmissible is overruled. In all other respects their motion for rehearing is granted. The portions of our original opinion in which we held the court erred in awarding Union and MPD interest as damages, and in which we taxed costs, are deleted therefrom. The remainder of the opinion is left unchanged. Black Lake's complaints concerning the awards of interest as damages are overruled.

All costs of trial and this appeal are taxed against Black Lake.